IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| LARRY ROGER BAISDEN, #298 382, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:15-vc-549-ECM |
| | ) | [WO] |
| OFFICER DEJARNETTE, | ) | |
| | ) | |
| Defendant. | ) | |

### **RECOMMENDATION OF THE MAGISTRATE JUDGE**

Plaintiff Larry Roger Baisden, an inmate incarcerated at the Staton Correctional Facility ("Staton") in Elmore, Alabama, filed the instant civil rights action under 42 U.S.C. § 1983. He complains that Defendant Corey Dejarnette, a correctional officer, assaulted him at Staton on June 6, 2015 when he attempted to go through the chow line for a second time. Baisden complains that Dejarnette struck him on the left side of his face, which knocked him to the floor and caused severe damage to his left ear. Doc. 1 at 2. Baisden requests injunctive relief, damages, and that Dejarnette receive a reprimand. Doc. 1.

Pursuant to 28 U.S.C. § 636(b)(1)(B), the court set this matter for an evidentiary hearing because there was a genuine dispute of fact about Baisden's claim of excessive force and neither party had requested a jury trial. The court conducted the evidentiary hearing on October 31, 2018. Considering all relevant testimony and exhibits against the

1

backdrop of the record,[1] the court concludes that judgment should be entered in favor of Defendant Dejarnette and against Plaintiff Baisden.

## I. EVIDENTIARY FINDINGS

The evidentiary hearing proceeded on a single issue—whether Officer Dejarnette subjected Baisden to an unprovoked and malicious use of force by striking the left side of his head with such force that it knocked him to the ground.  As evidentiary support for his claim, Baisden testified and also relied on the testimony of a fellow inmate, Kevin Martin, and Correctional Officer Robert Fitts.  For his defense, Officer Dejarnette testified and presented testimony Dr. Karen Stone.

Martin was summoned as a plaintiff's witness.  According to Martin's testimony, Baisden could not have been attempting to eat twice on the day in question because Baisden woke Martin up on his way to the chow hall.  Martin testified that he was on his bed in C Dorm on June 6, 2015 when Baisden, who slept one bed over from Martin, tapped Martin on his way to the chow hall and asked Martin to go with him.  Martin testified that he was behind Baisden when they got to the chow hall and he saw Dejarnette strike Baisden in the face without provocation and push him into a wall.  On cross-examination, Martin admitted that in his previous written affidavit he had stated that he observed Dejarnette strike Baisden one time but did not mention the officer pushing Baisden into a wall.  Martin further acknowledged on cross-examination that Baisden's inmate movement sheet

---

[1] In particular, the court relies on the Complaint (Doc. 1); the Answer, Special Report, and Supporting Exhibits (Docs. 23 & 35), and the Response to Special Report (Doc. 36).

reflected that Baisden was housed in E Dorm on June 6.[2] Martin testified on direct examination that Officer Fitts was working at the ID scanner at the entrance to the chow hall that day. During Officer Fitts' direct examination by Baisden, the officer testified that on June 6, 2015 his assignment in the chow hall was at the tray window and that Correctional Officer Duncan was assigned to the ID scanner. In addition, Baisden admitted in his complaint and during his testimony that he was, in fact, attempting to eat for a second time. Upon consideration of Martin's testimony, his sworn affidavit contradicting his testimony, and light of other testimony provided by Officer Fitts and Baisden that also contradicts material portions of Martin's testimony, the court finds his testimony not to be credible.

Baisden also called as a witness Robert Fitts,[3] who was employed as a correctional officer at Staton on June 6, 2015.[4] According to Fitts' testimony, his post on the day and time in question was at the chow hall where he was assigned to check the color of inmate wristbands at the tray window where inmates pick up their meal tray.[5] Fitts' post was

---

[2] According to Officer Dejarnette's testimony, inmates wear colored wristbands corresponding to their assigned dorms are called to the chow hall by their dorm assignment. If the color of an inmate's wristband does not match the color of the dorm called to chow, the inmate is ordered back to his assigned dorm.

[3] Baisden had requested an "Officer Duncan" be subpoenaed to testify on his behalf at the evidentiary hearing. On October 23, 2018, the subpoena was returned unexecuted because more than one officer with the last name of Duncan works at Staton. Although the subpoena return included a request to "please provide Officer Duncan's first name," Doc. 80 at 1, Baisden made no further effort to ensure this individual's presence at the hearing.

[4] Officer Fitts is no longer employed by the Alabama Department of Corrections.

[5] The court notes that Baisden challenged Officer Fitts' prior testimony regarding his assigned post in the chow hall on June 6, 2015. While immaterial to the resolution of the dispute at issue, the court notes that Fitts' affidavit submitted in support of Dejarnette's special report did not mention where in the chow hall he was posted at the time of the alleged incident. Doc. 23-2. The brief submitted in support of Dejarnette's special report stated that Fitts was working the scanner at the entrance to the chow hall. Doc. 23 at 2. Counsel's statements and arguments in brief, however, are not evidence on which the court relies. Fitts' testimony at the hearing indicated that his post in the chow hall on June 6, 2015 was at the tray window.

located approximately 25 to 30 feet from the entrance to the chow hall, but Fitts did not see Dejarnette strike Baisden at any time. According to Fitts, if an incident like the one described by Baisden had occurred, not only would Fitts have noticed it from his post but the officer involved in the incident would have made a call on his radio for other officers to respond to the scene of the incident.

Baisden testified that on June 6, 2015 he ate chow at the correct time for his dorm, Dorm E, then attempted to go through the chow line for a second helping of food. When he reached the first checkpoint entrance to the chow hall, Dejarnette stopped him. Baisden, realizing Dejarnette wanted to have his ID card scanned again to verify that he had just eaten, testified that he then admitted to Dejarnette that he already had his meal and it was, therefore, unnecessary to have his ID card checked. Dejarnette insisted that Baisden follow him to the scanner where Duncan scanned Baisden's ID card. Baisden testified that Dejarnette, with no provocation, then struck him with a closed fist on the left side of his head above his ear and by his left temple, causing him to hear a ringing noise. Baisden testified that the blow to the side of his head caused him to bump up against the wall and fall to the ground. Baisden then got up off the ground and walked away. According to Baisden's testimony, Dejarnette's assault caused him medical issues requiring two reconstructive surgeries on his right ear.

Dejarnette is employed by the Alabama Department of Corrections as a correctional officer at Staton, and was so employed on June 6, 2015. According to Dejarnette's testimony, he has no history with Baisden and has no recollection of any encounter with Baisden on June 6, 2015. He specifically denies ever striking Baisden. On the date in

question, Dejarnette testified that his post was in the chow hall, where he was assigned to the entrance door to check inmate wristbands to ensure the color of the inmate wristband matched the dorm called for chow. Dejarnette testified that department records indicating the inmates' movement history within the prison system reflect that Baisden and Martin were not housed in the same dorm on June 6, 2015—Baisden was in E Dorm and Martin was in C Dorm. Dejarnette testified that bed roster checks are performed regularly to confirm that inmates remain in their assigned dorms. At chow time, Dejarnette testified that if the color of an inmate's wristband indicated it was not the inmate's turn to eat, his response would not be to strike the inmate but to issue a direct order to the inmate to return to his assigned dorm until it was his turn for chow. If an inmate had been knocked to the floor in the chow hall, Dejarnette testified that other officers would have seen it happen.

Dr. Karen Stone, summoned as a defense witness, provided no corroborative testimony for Baisden's account of his exchange with Dejarnette.[6] According to her testimony, she spends significant time on patient care but has never treated Baisden. However, she reviewed relevant portions of his medical records to prepare for the evidentiary hearing. Dr. Stone testified that Baisden's medical records reflect that on June 7, 2016 he submitted a health services request form stating he had been hit on the left side of his face/head by a correctional officer the day before, and that he had pain in his ear and down his jaw and associated dizziness. On June 8, 2015, medical personnel examined

---

[6] Dr. Stone is an Assistant Medical Director for the southern Alabama prisons employed by Wexford Health Care, which holds the contract to provide healthcare to inmates incarcerated in the Alabama Department of Corrections. Prior to being employed by Wexford Health Care, she was employed by Corizon Incorporated, which was the prison healthcare provider at the time of Baisden's alleged incident.

Baisden for his complaint, but observed no swelling or redness. Baisden then submitted a sick call request on June 9, 2015 regarding an abscess or boil on his left arm. Baisden's medical records show that the medical staff examined him on June 10, 2015, and found a small abscess on his left arm with no drainage for which he was prescribed an anitibiotic. On June 17, 2015, Baisden submitted a health services request form complaining of left ear pain that he described as feeling like a "busted eardrum." Medical staff noted evidence of an ear infection and placed him on antihistamines and antibiotics. Medical staff followed up with Baisden within approximately one week and noticed Baisden's left eardrum was clear.

On July 1, 2015, a consultation request for a hearing test was submitted by a nurse regarding Baisden's complaint he could not hear out of his left ear. The consultation request noted that the date of onset was six months earlier. The request was approved, and Baisden had his offsite hearing test on September 17, 2015. The audiologist who examined Baisden on September 17, 2015 noted that he reported a hearing loss following an altercation with an officer on June 6, 2015. The report showed some hearing loss in the high frequency range consistent with a possible noise injury. The audiologist saw some possible Eustachian tube dysfunction in the left ear. The audiologist further noted that Baisden's right ear had a hole in the eardrum, which is where his main hearing loss was located. It was recommended that Baisden see an ear, nose, and throat ("ENT") specialist.

Dr. Stone testified that on September 18, 2015 a consultation request was submitted for Baisden to be seen by an ENT, and on September 24, 2015 the request was approved. On October 7, 2015, an ENT examined Baisden and found his left ear canal clear with an

6

intact tympanic membrane without perforation or effusion. The physician noted that Baisden now complained that he had been struck on the right side of his face and noted the hole in Baisden's right ear—described by the physician as a traumatic perforation—was likely due to Baisden's description of his injury. The ENT also noted hearing loss in Baisden's right ear and recommended he have surgery on his right tympanic membrane with the perforation.

Baisden underwent a tympanoplasty procedure on December 8, 2015 for a right-side tympanic membrane perforation. During surgery, the surgeon determined the severity of Baisden's ear condition was due to tympanosclerosis, which required a total tympanic reconstruction of the right eardrum and resulted in the surgeon's decision to abort the surgery. Medical staff at Staton then submitted a consultation report on December 8, 2015 for Baisden to have surgery in Birmingham, Alabama, to perform a total reconstruction of his tympanic membrane. Medical staff at Staton then submitted a consultation request on December 28, 2015 for Baisden to undergo a complete reconstructive surgery of his right tympanic membrane by an otologist in Birmingham, Alabama.

Baisden underwent reconstructive surgery in 2016 in Birmingham. At his six-week check-up following the procedure, Baisden's physician found his eardrum intact. During a check-up in June 2018, the physician noted the right ear repair surgery had failed and the perforation had reappeared. The physician made a notation that Baisden indicated the hole may have reappeared because he had been in several altercations since the surgery. The physician observed no drainage and Baisden reported no pain and indicated that he did not wish to undergo another surgery but would like to try a hearing aid. A request was made

by prison medical personnel that Baisden be evaluated for a hearing aid, but the request was denied because Baisden's hearing in his left ear could compensate for the hearing loss in the right ear, because he had only mild to moderate hearing loss, and because he had good speech discrimination.

Dr. Stone testified that tympansclerosis tends to occur in people with recurrent childhood ear infections. The recurrence of the infection causes hardening and calcification, which deposits collagen in the eardrum and the bones around the eardrum and causes the eardrum to harden. Dr. Stone testified that if that condition continues and progresses, as it has with Baisden, it can cause significant hearing loss, but that the loss is gradual and occurs over ten years or more. By the time a patient is recommended for surgery due to tympanosclerosis, 90% or more of patients already have a hole in their eardrum. Dr. Stone testified that in her opinion the condition of Baisden's right ear was not caused by a traumatic blow to the head but likely was due to a long-term process over a significant period. In fact, Dr. Stone opined that none of Baisden's ear problems resulted from being hit on the head. Dr. Stone further testified that perforations due to trauma are generally caused by a direct slap or punch to an ear, which creates a significant pressure change and may create a hole in the eardrum. Finally, other than some high frequency hearing loss in Baisden's left ear, Dr. Stone testified that Baisden's left ear is otherwise normal.

## II. DISCUSSION

A.  **Excessive Force Standard**

Claims of excessive force by prison officials against convicted inmates are governed by the Eighth Amendment's proscription against cruel and unusual punishment. *Campbell v. Sikes*, 169 F.3d 1353, 1374 (11th Cir. 1999).

> Under the Eighth Amendment, force is deemed legitimate in a custodial setting as long as it is applied "in a good faith effort to maintain or restore discipline [and not] maliciously and sadistically to cause harm." *Whitley v. Albers*, 475 U.S. 312, 320–21, 106 S. Ct. 1078, 89 L. Ed. 2d 251 (1986) (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2nd Cir. 1973)); *see also Hudson v. McMillian*, 503 U.S. 1, 8, 112 S. Ct. 995, 117 L. Ed. 2d 156 (1992). To determine if an application of force was applied maliciously and sadistically to cause harm, a variety of factors are considered including: "the need for the application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response." *Hudson*, at 7–8, 112 S. Ct. 995; *see also Whitley*, 475 U.S. at 321, 106 S. Ct. 1078; *Harris v. Chapman*, 97 F.3d 499, 505 (11th Cir. 1996). From consideration of such factors, "inferences may be drawn as to whether the use of force could plausibly have been thought necessary, or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." *Whitley*, 475 U.S. at 321, 106 S. Ct. 1078 (quoting *Johnson*, 481 F.2d at 1033).

*Skrtich v. Thornton*, 280 F.3d 1295, 1300–01 (11th Cir. 2002).

In *Hudson v. McMillian*, 503 U.S. at 9, the Supreme Court held that the use of excessive physical force against a prisoner may constitute cruel and unusual punishment even though the prisoner does not suffer serious injuries. On the other hand, "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." *Johnson v. Glick*, 481 F.2d 1028, 1033 (2nd Cir. 1973). Whether a defendant's use of force is

9

excessive, and thus violative of an inmate's right to be free from cruel and unusual punishment, "depends on whether the [defendant's] act 'shocks the conscience,' and it necessarily will if the force 'was applied . . . maliciously and sadistically for the very purpose of causing harm.'" *Danley v. Allen*, 540 F.3d 1298, 1307 (11th Cir. 2008) (quoting *Cockrell v. Sparks*, 510 F.3d 1307, 1311 (11th Cir. 2007); *Whitley*, 475 U.S. at 320–21). An excessive force claim "necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not a sort 'repugnant to the conscience of mankind.'" *Hudson*, 503 U.S. at 9–10 (quoting *Whitley*, 475 U.S. at 327); *Brooks v. Kyler*, 204 F.3d 102, 103 (3rd Cir. 2000) (finding that there is "no fixed minimum quantity of injury that a prisoner must prove that he suffered" in order to state an excessive force claim).

Notwithstanding the fact that a *de minimis* use of force will rarely suffice to state a constitutional claim, a plaintiff is not required to show that the application of force resulted in serious injury. *Hudson*, 503 U.S. at 8. Rather, the key inquiry under *Hudson* is whether the alleged conduct involved "unnecessary and wanton infliction of pain." *Id*. While the Supreme Court recently emphasized that its holding in *Hudson* does not stand for the proposition that a "certain quantum of injury [must be] sustained, but rather 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm,'" the Court further noted that requiring a showing of injury would permit any punishment, "no matter how diabolic or inhuman," absent some quantum of injury. *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (quoting *Hudson*, 503 U.S. at 7 & 9). The absence of serious

10

injury, however, is relevant in that the extent of injury could indicate whether the use of force was necessary and could provide an indication of the amount of force actually applied. *Id*.

**B.     Evidentiary Analysis**

No evidence—testimonial or documentary—corroborates Baisden's account of being assaulted by Officer Dejarnette, and Baisden's own testimony is far from persuasive on the material facts. Although Baisden remains steadfast in his allegation that Dejarnette struck him across the side of his head, he does not dispute the medical reports' description of his condition following the alleged incident. Those records reflect that Baisden self-reported left ear pain after being struck by an officer on the left side of his face but otherwise showed no sign of redness or swelling or other changes to the integrity of his skin, and that medical personnel provided no treatment. While Baisden received treatment for a left ear infection approximately one week later, his complaints of hearing loss were diagnosed as a symptom of tympanosclerosis in his right ear.

Moreover, the witnesses that the court finds to have provided credible testimony about the interaction between Baisden and Dejarnette corroborate Dejarnette's description of events. The court does not find credible Baisden's allegation that Dejarnette, acting wholly without provocation, struck him on the left side of his head and knocked him to the floor when no other correctional officers within close proximity to the location of incident noticed Dejarnette's attack or radioed for assistance and no officer generated an incident report in response to the

11

event. In addition, the witness testifying and found to be credible regarding Baisden's medical records did not corroborate any sign of injury to Baisden's left ear despite the severity of the injury Baisden described.

### III. CONCLUSION

The credible evidence supports Dejarnette's testimony that he never touched Baisden—much less forcefully struck him across his head knocking him to the floor. The court concludes that the record establishes no constitutionally impermissible use of force by Dejarnette, and he is, therefore, entitled to judgment as a matter of law.

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that judgment be entered in favor of Defendant Corey Dejarnette, that this case be dismissed with prejudice, and that the costs of this proceeding be taxed against Plaintiff for which execution may issue.

It is further ORDERED that **on or before November 22, 2018**, the parties may file an objection to the Recommendation. Any objection filed must specifically identify the factual findings and legal conclusions in the Magistrate Judge's Recommendation to which a party objects. Frivolous, conclusive or general objections will not be considered by the District Court. This Recommendation is not a final order and, therefore, it is not appealable.

Failure to file a written objection to the proposed findings and recommendations in the Magistrate Judge's report shall bar a party from a *de novo* determination by the District Court of factual findings and legal issues covered in the report and shall "waive the right to challenge on appeal the district court's order based on unobjected-to factual and legal

conclusions" except upon grounds of plain error if necessary in the interests of justice. 11th Cir. R. 3-1; *see Resolution Trust Co. v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989).

    DONE on this 8th day of November, 2018.

/s/ Gray M. Borden
GRAY M. BORDEN
UNITED STATES MAGISTRATE JUDGE